[No. 2262.]

W. J. WOOD *v.* THE STATE.

MURDER—EVIDENCE—PRACTICE.—If, when a party is examined as a witness in proceedings before a magistrate's court or a coroner's inquest, he is charged or suspected of the crime then under investigation, and is then aware that he is so charged or suspected, his testimony before the said investigation can not be received against him upon his trial for the same offense. See the opinion *in extenso* for circumstances under which it is *held* that the defendant was in such duress when testifying before the coroner's inquest that his testimony before that tribunal was incompetent against him on this trial. The mere fact, however, that defendant was a witness at the inquest, and was placed under the "rule," would not bring his then testimony within this rule.

APPEAL from the District Court of Callahan. Tried below before the Hon. T. B. Wheeler.

The indictment in this case was presented in the District Court of Nolan county, Texas. It charges the appellant with the murder of Ben Warren, in said Nolan county, on the tenth day of February, 1885. Changes of venue, upon the motion of the court in each case, were had respectively from Nolan to Mitchell county, and from Mitchell to Callahan county, in which latter

county the trial was had, resulting in the defendant's conviction of murder in the first degree, his punishment being assessed at a life term in the penitentiary.

This case was before this court at the Tyler term, 1885, on appeal from a judgment of the district court of Nolan county, in a proceeding under habeas corpus for bail, which was refused. That judgment was based upon the identical evidence that was used on the habeas corpus trial of the appellant's codefendant, Neil Boyett, which will be found stated at length in the report of the case of Ex parte Boyett, beginning at page 17 of the nineteenth volume of these reports. Of the witnesses who testified on the habeas corpus trial of the said Boyett, the following testified upon this trial, narrating substantially the same facts, viz: E. Lormey, J. A. Durham, L. F. Otey, H. H. Williams, H. G. Bardwell, T. L. Odom, A. W. Hilliard, J. H. Beall, J. E. Warren, Fred Beall, O. B. Seitz, P. G. Bradley, Joseph Boone, Mrs. O. B. Seitz and Mrs. Otey. The testimony of those witnesses as set out in the said report, is here referred to, and the additional testimony adduced upon this trial appears below, in the order in which it appears in the record. Other facts, as shown by bills of exception, appear in the opinion of the court.

A. A. Hanscomb testified, for the State, that he was the foreman of the grand jury of Runnels county, Texas, in May, 1884, when a number of indictments were found against various parties, charging them with the offense of fence cutting. Among the parties so indicted were the defendant and Neil Boyett, Mac Boyett, and two men named Hylton. The deceased, Ben Warren, was the most material witness against the defendant and Neil Boyett. At this point the State introduced in evidence the indictments, ten in number, spoken of by the witness.

J. T. Moore testified, for the State, that he was in the Bennett saloon in Sweetwater when the shot that killed Ben Warren was fired. The defendant and Neil Boyett were in that saloon a few minutes before that shot was fired. The defendant borrowed the witness's over coat, which was of a dark color. He and Boyett said that they were going to bed, but did not say where they were going to sleep. When the witness saw the defendant and Neil Boyett earlier on that evening, they had on light colored over coats. Witness did not see them have any fire arms on that night.

A. S. Hill testified, for the State, that he lived in Sweetwater,

Nolan county, Texas, when Ben Warren was killed. His house was situated south of the depot, and about one hundred and twenty-five yards distant from it, on the road leading to Wilson Hunt's house. Witness heard the fatal shot, and immediately afterwards he heard the footsteps of parties he thought to be running. The witness could not tell from which direction the parties came, nor in which direction they were going. The witness's house was situated between two hundred and two hundred and fifty yards distant from the Central Hotel. The road forks at a point nearly opposite the witness's house. The main road leads to the Wilson Hunt neighborhood, and the fork, a dim road, passes in the rear of the opera house, and thence to Henry Beall's house. The witness was a justice of the peace for Nolan County, Texas, in 1884, and recognized a paper exhibited as an appearance bond executed before him by the deceased, under a charge of cattle theft based upon the complaint of E. Hylton.

Cross examined, the witness said that he heard of the killing of Warren on the morning after it occurred. Defendant came by his house very early on that morning, going from Hunt's house to town, and told him that Ben Warren was killed the night before. Witness observed nothing unusual about his manner or appearance.

The State next introduced in evidence the testimony of the defendant taken upon the coroner's inquest. This is the evidence upon which the opinion of this court is predicated. The inquest was had on the morning after the tragedy. The testimony is as follows.

"I stayed in town the early part of last night. I ate supper at the restaurant. I ate two suppers. I ate about dark, and then a lunch about twelve o'clock. Riley Hylton, Neil Boyett, Mac Boyett, Clark, Joe Akin and some others also ate at the same time. I think I went from there to Bennett's saloon. I would not be positive whether the other boys went with me into the saloon or not. They were passing backwards and forwards from one saloon to the other. I think I saw Mac Boyett the last time at Johnson's saloon. Riley Hylton was not with Mac Boyett. I did not hear a pistol fire. I expect I was at Henry Beall's.

I and Neil Boyett went from Bennett's saloon down to Beall's, and stayed there until late. It was between eight and nine o'clock when we went to Beall's. It must have been near twelve when we left Beall's. We intended to stay all night at Beall's,

but he was crowded, so we concluded to come back and stay at the hotel. We went from Bennett's over to the depot and crossed the railroad track, and then went down the railroad to Beall's. Neil carried his Winchester, forty-four calibre, with him down to Beall's. I first noticed Neil having his gun somewhere near Bennett's. I do not know just how long we were at Beall's before Beall came. We stayed about an hour, may be longer, after Beall came home, before we left. We came by the opera house from Beall's. Neil put his gun with' his saddle and tricks. We then came over to the restaurant. We did not see any one at the opera house as we came back from Beall's. We went into the restaurant and ate some eggs. I left Riley Hylton at the restaurant. The cook told me about Warren being dead. H. G. Bardwell wanted me to sit up with the corpse. I told him that I was unwell, but that Jim Warren was in town, and that I would go down and let him know it; so I went down to Hunt's and told Jim Warren that Ben Warren was killed. Jim said he reckoned not, and I told him' that he was. He then asked me how Ben was killed. I told him I did not know the particulars, only that I had heard Ben was shot in the head. I told him if he needed any help to let me know and I would assist him. I went to bed at Hunt's and stayed there all night. I suppose Neil took his gun to Beall's for fear it would be misplaced at the saloon.

"Nothing was said at Beall's about a shot being fired up in town or any body being killed. There might or might not have been some remarks made at Beall's about Odom's case that was to come up, but I don't remember. Neil Boyett did not say to Mrs. Beall not to mention he and Wood having been at Beall's. I did not state to Jim Warren that I first heard of the killing at Beall's. I did not state to him that I first heard of the killing at the restaurant. If you suspicion, it would be a good idea to get Neil's gun and look at it. If you want to see my gun, it is under the bed at Hunt's. There was no good feeling existing between Ben Warren and the boys Ben had indicted. I saw Neil Boyett with a nickel plated pistol yesterday, that he had just had repaired. I have a pistol with my gun at Hunt's, and I ask the jury to go and examine the gun and pistol to satisfy themselves as to whether or not they have been shot lately."

John C. Cox testified, for the State, that he was district clerk of Nolan county, Texas, at the time that Ben Warren was killed. He saw defendant and Neil Boyett in Sweetwater on that day.

He saw them again early next morning at the foot of the stairs, in the court house, and observed a peculiar twitching about the mouth of the defendant. His appearance was unusual. He appeared depressed and uneasy. He and Neil Boyett shook hands with witness very cordially, and asked for County Attorney Scarborough. Witness had not heard of Warren's death at that time.

Professor F. W. Chatfield testified, for the defense, that early on the fatal night he was in the Palace Hotel, in Sweetwater, having his teeth worked upon by Doctor De Moore, the dentist. A few minutes after nine o'clock Doctor De Moore suggested that the work suspend for the night. A few words were exchanged between witness and DeMoore and they went into the hotel office, lit cigars, took seats and chatted awhile. The witness then left the Palace Hotel to go home. He went around the southeast corner of that hotel, up the side walk by the Central Hotel, passing near the edge of the front gallery of that hotel. Thence he went angling across the street, home. The witness did not meet or see any one in the street or alley near the Central Hotel. Several men were then sitting in the Central Hotel office, but every thing was quiet on the streets. According to the witness's best judgment it was about half past nine o'clock when he passed by the Central Hotel. Witness lived about five hundred yards from the Central Hotel. When he got home he read a chapter and then conversed awhile with the members of his family. He then proceeded to undress to go to bed, and while thus engaged he heard the report of a pistol. It was, in the opinion of the witness, fifteen minutes before ten o'clock when that pistol fired, though it may have been a few minutes later or earlier. Witness did not consult a time piece after he left the Palace Hotel, and he fixed the time when the shot was fired by calculating the time it should take him to walk home over the route he traveled.

Mrs. Julia N. Boone testified, for the State in rebuttal, that she was the wife of Joseph A. Boone. Witness's husband left home to go to the railroad depot at exactly half past nine o'clock on the night that Ben Warren was killed. He had not been gone more than three or five minutes when the fatal shot was fired. Witness remembered the time well, because the first inquiry the shot suggested to her mind was: "Has Mr. Boone had time to reach the depot?" She concluded that he had not.

The motion for new trial raised the questions discussed in the opinion.

B. G. Johnson, for the appellant: The court below certainly erred in overruling the defendant's motion for continuance, to procure the evidence of county judge J. W. Germany and Mrs. J. H. Beall.

The motion shows complete diligence, and the record shows that the district attorney admitted that both of these witnesses were in bed sick and unable to be brought into court at the time of the trial. The case had never before been set or called for trial in the court where the case was tried. It was the first application for continuance. It is in all things in strict compliance with the statute. These propositions being proved true by the record, then there is only one question remaining in it: Was the evidence sought material to any part of the defense?

Judge Germany was the county judge of the county where the coroner's inquest was held, and as an officer of the county was present and aiding the district attorney and the sheriff and coroner in the inquisition, and his testimony would have proved that, at the time defendant testified before the jury of inquest, defendant was really not only in custody and held as a witness, but that defendant was then, and had been during the entire day previous, held in custody and under arrest by the sheriff as a prisoner to await the conclusions of the coroner's jury, and that he was so arrested and held in confinement upon the advice of Judge Germany and the district attorney, who consulted together, and also with the sheriff, as to the detention of the defendant for this purpose. Would not this evidence have been vitally material, taken in connection with the testimony of county attorney Scarborough, J. F. Eidson and Sheriff Bardwell? There can be no question of the materiality of this evidence in determining the admissibility of the statements made by the defendant before the coroner while defendant was in custody of the sheriff.

Was this evidence probably true? It is so strongly corroborated by the evidence of Scarborough, Eidson and Bardwell that the truth of it can not be doubted. Mrs. Beall's testimony would prove virtually an alibi for defendant, and her expected testimony was strongly corroborated by Mrs. Seitz, who testified at the trial.

It was a trial on circumstantial evidence alone, and a defend-

ant had the right to establish his alibi by more than one witness, and the expected testimony of Mrs. Beall is much stronger, and more positive than that of Mrs. Seitz. On this proposition my associate counsel cite Adams v. The State, 19 Texas Court of Appeals, 1; Miller v. The State, 18 Texas Court of Appeals, 576; Harris v. The State, 18 Texas Court of Appeals, 287.

The law gave defendant the absolute right to have these witnesses present in the trial, so that the court and jury by observing their conduct, appearance and manner of testifying from the stand, under direct and cross examination, might judge of the credibility of the witnesses and of the weight of their evidence; and the offer of the district attorney to allow the use of the written evidence of these two witnesses, taken before the examining trial, was properly refused for those reasons, and for the stronger reason that said written evidence does not contain all the facts sought to be proved by these witnesses as stated in the bill of exception. The motion for continuance should have been granted.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for murder of the first degree, with a life sentence in the penitentiary, for the homicide of Ben Warren. Quite a number of errors are assigned, but we desire to discuss but one, holding those not referred to to be not well taken.

From a bill of exceptions it appears that, on the morning after the homicide, this defendant, Wood, and several other witnesses, were sworn and placed under the rule in charge of the sheriff; and that they were so held during the entire day and a portion of the night. About twelve o'clock of that day the sheriff was informed, either by Germany, the county judge, or Scarborough, the county attorney, that suspicion was pointing very strongly to Mr. Boyett and defendant, Wood, as the guilty parties. About sundown of that day, the sheriff was further informed, either by the county judge or county attorney, or Steele, the justice who was holding the inquest, that the developments before the inquest were such as would saddle the guilt upon Boyett and Wood, this defendant, and that after they were examined as witnesses, he had better separate them from the other witnesses, and not permit them to talk to any body; that, some time after dark of that day, the sheriff inquired of Mr. Eidson if

he could take charge of Boyett, Wood and one Hylton, and hold them for him, and keep them from talking to any one, and, at the same time, asked Eidson if he had his gun. Eidson replied that he would, on his return from his supper. Boyett, Wood and Hylton were taken from the room in which all the witnesses were kept, before the coroner's jury, one at a time, and after testifying each was taken and placed in Eidson's charge. The recollection of the sheriff, who was a witness, was that they were not placed in charge of Eidson until after testifying before the jury of inquest. Wood was not informed by the sheriff of the suspicion against him before he testified at the inquest. The above is substantially the testimony of the sheriff bearing on the question presented in the bill of exceptions.

Mr. Scarborough, county attorney, states that he had a number of witnesses, including defendant and Boyett, placed under the rule early in the morning, and before the jury began their investigations, for *the double purpose* of holding them as witnesses, preventing them from conversing with their friends, and preventing the escape of the parties if the facts developed should authorize their arrest. These purposes were not made known to any of the parties confined. That he told the sheriff before Boyett, Wood or Hylton testified that after they testified to take them to another room and keep them separated from the other witnesses; that the defendant was not released from the time he was placed under the rule until his arrest.

Eidson states that about sundown the sheriff requested him to take charge of Wood, Boyett and Hylton ; that he agreed to do so on his return from supper; that on his way home Germany, county judge, told him that Boyett and Wood were the guilty parties, and would, as such, be sent to jail; that when he returned the sheriff brought Boyett, Wood and Hylton and placed them in his charge in the court house, in witness's office, and placed him between the door and said parties, and instructed him to hold them. Some time after this the sheriff came and got said parties, one at a time, and carried them away; that he did not know where they were taken, but thought they were taken before the jury of inquest, which was in session in a room in the court house not far from his office; that the parties were placed in his charge about eight o'clock at night, and within about fifteen or twenty minutes afterward they were first placed in his charge. Wood appeared to be very anxious, and asked him if he knew how matters stood. Eidson told Wood that he would

have to go to jail that night; that this was a voluntary statement, not having been made to Wood by instructions from the sheriff or any one else. Eidson is an attorney, and upon the trial of this cause appeared for appellant. All of this was said and done between eight and nine o'clock that night. Eidson was positive it was not later than nine o'clock. This occurred before the sheriff took either of the parties out of his office, as herein before stated.

Mr. Scarborough further testified that Wood gave his evidence before the jury of inquest between ten and eleven o'clock that night. His best judgment was that it was about eleven o'clock and that Wood was not notified that he would be charged with the murder, nor that his evidence would be used against him.

Appellant Wood testified before the jury of inquest, and his evidence was reduced to writing and properly authenticated. Upon the trial the State, over the objections of appellant, introduced in evidence his testimony taken before the inquest. Appellant objected upon the grounds that he was under arrest at the time the evidence was given and was not cautioned as the law requires, and because the testimony was not voluntary. These objections were overruled, the evidence admitted, and appellant excepted and reserved the point by proper bill of exceptions.

This question will be treated independently of our statute upon the subject. A most admirable opinion upon this subject will be found in the case of The People v. McMahon, 15 New York. In that case the authorities are collated and from them the following rule is deduced: When a party is examined as a witness before a magistrate or coroner's inquest, and is afterward prosecuted for the same offense under investigation, his testimony so taken will not be received against him if, at the time of his examination, he was charged or suspected of the crime and that he was informed of the charge or suspicion against him. This, we believe to be the correct rule; that which is supported by the weight of authority.

It will be seen that the fact of arrest or no arrest does not figure in this proposition. Whether the party be under arrest, either by warrant or without warrant, or is not under arrest, if he is charged or suspected of the crime, and knows himself to be charged or suspected, his testimony taken before the magistrate or coroner's inquest is not admissible against him.

Now, let us apply this rule to the case in hand. Appellant

was informed by Eidson, who had him in charge, that he would be sent to jail that night. He had been, with a number of other witnesses, under the rule in another room; was taken by the sheriff from among them, and placed in charge of Eidson. He saw the sheriff when he placed Eidson between him and the door, and heard the sheriff tell Eidson to " hold them." From these facts it is evident to us that appellant was thoroughly informed that he was suspected of the murder of Ben Warren.

This being the case, his testimony taken before the coroner's inquest was not admissible as evidence against him; was not " voluntary" under the construction given that word in the McMahon case and authorities therein cited.

We have been considering the competency of this evidence under common law rules, without regard to our statute. How stands the question when viewed in the light of our statute?

If in arrest or custody, not being cautioned as the statute requires, his testimony is evidently not competent. Was appellant in arrest when he gave his evidence before the inquest? For the party to be in arrest it is not necessary that the officer should say to him, "I arrest you," or "You are my prisoner," or to use any certain words in making the arrest. The arrest may very clearly be proved by the surrounding facts. (Nolan v. The State, 9 Texas Ct. App., 419.)

Looking, then, to the facts which surround this matter, there can be no question but that appellant was in arrest, and not being cautioned as the code requires, his testimony taken before the inquest was not competent evidence against him. We must not be understood as indicating that, because appellant was sworn and placed under the rule and testified as a witness, therefore he was under arrest or in custody within the meaning of Articles 749 and 750, Code Criminal Procedure.

For the error in admitting the testimony of appellant taken before the jury of inquest, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 17, 1886.