JOHNNIE SANDERS V. THE STATE.

No. 21294. Delivered December 4, 1940.

The opinion states the case.

*Bennett & Bennett,* of Normangee, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is receiving and concealing stolen property; the punishment, confinement in the penitentiary for two years.

J. C. Cleere testified that on or about the 22nd of June, 1939, he lost two head of cattle. It was the theory of the State, given support in the evidence, that Richard Brown and William Ashley stole the cattle and sold them to appellant, appellant knowing such cattle to have been acquired by theft at the time he bought them. It was the further version of the State that the stolen cattle were butchered by appellant and sold to the C. & W. Grocery Company, which was situated in Madisonville.

The State introduced in evidence appellant's voluntary statement, which, omitting the warning, reads as follows: "About nine o'clock on the evening of June 22nd, 1939, Rich Brown and William Ashley, both negroes, came to my house in Madisonville and told me they had two yearlings tied out on the hill at Mr. J. L. Cleere's pasture of State Highway No. 21, they got in my truck with me and we went out there together and got one white and one red yearling, the red may have had some roan color but I am not positive. We took these yearlings to my house that night and butchered them the next morning around seven or eight o'clock, and sold them to the C. & W. Grocery store in Madisonville, and give the C. & W. Grocery store the hides of these yearlings. I gave William Ashley seventeen dollars for these yearlings, he did not tell me where he got these yearlings. I got $58.32 for these two yearlings. They did not say how they got this stuff or yearlings, they told me they had the yearlings out there. Rich Brown had helped me butcher cattle before. When we got out to Mr. Cleere's pasture I turned my headlights off and drove in the pasture and back to some timber or shade trees where the yearlings were tied and we loaded them on a truck and William Ashley left us and Rich Brown and myself drove on out the pasture and when I got to the gate I turned my lights back on and went home in the Eastern part of Madisonville. I paid William Ashley the seventeen dollars for these yearlings on Saturday morning, June 24th, 1939, down on the jail lot in the town of Madisonville, Texas. William Ashley told me Wednesday the 21st of June that he had two yearlings that he wanted to sell me."

For the purpose of supporting the theory that appellant knew the cattle were stolen at the time he received them, the State proved by the sheriff that when he questioned appellant concerning the stolen animals appellant told him that he bought such animals from parties other than Richard Brown and William Ashley. It is appellant's contention, as shown by a proper bill of exception, that he was under arrest at the time he made the declarations in question, and that the provisions

of Article 727, C. C. P., relating to confessions, had not been complied with. We quote said article, in part, as follows:

"The confession shall not be used if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in the custody of an officer, unless made in the voluntary statement of accused, taken before an examining court in accordance with law, or be made in writing and signed by him; which written statement shall show that he has been warned by the person to whom the same is made: First, that he does not have to make any statement at all. Second, that any statement made may be used in evidence against him on his trial for the offense concerning which the confession is therein made; or, unless in connection with said confession, he makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed."

As shown in the bill of exception relating to the question, the sheriff testified as follows:

"I am sheriff of this county and was in 1939. I know the defendant. I saw him along the 23rd, 24th or 25th of June, 1939. I remember hearing about Mr. Cleere losing some cattle along about that time. I first saw the defendant along that date in Fred Westmoreland's store. I didn't have a conversation with him no more than just spoke to him. There was no discussion with reference to Mr. Cleere's cattle at that time. Later I sent for Mr. Sanders and had him brought into my office to question him. I questioned Sanders when he was brought to my office. I asked him if he butchered for the C. & W. Friday and he said he did. I asked him what he butchered. He said he butchered a white calf and a red one. I asked him where he got those two calves. He said he bought one of them from a negro out here at Bus Terrell's which is about 7 miles out of Madisonville. He said he had bought the other one from Cap Westmoreland down here east of town. I asked him if he could show me the negro that he bought this white calf from. He said he didn't know, but if I would go with him he would show me. He said if I would go with him he would carry me and show me the negro he bought the white calf from. I told him I was ready. We got in Johnny Sander's car and went out 21. Mr. Sanders, the defendant, was driving the car. We went out 21 beyond Cottonwood Prairie Store, where the school house is to the left, and I asked the defendant where he was going and he said that

he was going to show me the man he bought the calf from. I told him he told me he bought it from a negro on Bus Terrell's place and he said he would show me who he bought it from. He carries me to Clint Magness' down in the Kickapoo community and we got up there right at 12 o'clock. That is about 10 miles from here. The defendant called him out there and asked if he didn't sell him a white calf some three or four weeks before hand and Clint wanted to know what was the trouble and he said, 'Well, the sheriff wants to know where I got a certain calf' and Clint said he sold him a Jersey calf three or four weeks before that. I asked Clint if it was a white Jersey calf and he said 'no, it was a cream-colored calf. I have its mother out there and the calf was exactly the color of it's mother, only one a cow and the other a calf.' So we looked at the cow. She was a cream-colored Jersey cow. I told him that was all I wanted to know and the defendant and myself got in the car and came back to Madisonville and it wasn't mentioned. I did not have him arrested. We came into Madisonville and drove around there and I got out of his car and asked him to go with me to dinner. It was then 15 minutes after 12. The defendant said that he had to go in; that he had some work to do. I said 'no, you have got to satisfy me about these cows first. You meet me back down here at one o'clock.' I went on to the house and came back and didn't see the defendant any more until three or three-thirty that afternoon. I left the defendant about 15 minutes until one o'clock. When I saw the defendant the next time he was in jail talking to Rich Brown but we had Rich Brown arrested and put in jail and the defendant was standing there talking to him. I had the defendant arrested and put in there with Rich. That was around two or three o'clock in the afternoon. I never did go to see that negro that Sanders was talking about. The defendant did not go with me anywhere else but I went to Cap Westmoreland's to know if Cap had sold him a red heifer calf. Cap said he had never sold Johnny Sanders a calf or a cow in his life. I sent Mr. Martin, my deputy sheriff, to go and tell the defendant to come over to where I was. I didn't have the defendant under surveillance from that time until I saw him at the jail. If I had I wouldn't have turned him loose. The defendant asked me coming in if that satisfied me and I said 'No, you haven't told me nothing.' When I left the defendant at lunch time I told him I wanted him to meet me back down here at 1 or 1:30 and the defendant told me he had some work to do. I told the defendant he had me to satisfy about the yearling first. I was acting as sheriff when I was talking to him. I went with the defendant out to the place

I just was talking about. He proposed to carry me out and show me the negro he had got this white calf from. I don't believe that I would have let the defendant go until he had taken me out and showed me something. At the time we went out there I don't know where my car was."

It is manifest from the sheriff's testimony that he had learned that Mr. Cleere had lost some cattle; that he (the sheriff) had appellant brought to his office for the purpose of questioning him; that he had determined at the time he had appellant brought to his office that he would not release appellant until he (the sheriff) became satisfied that appellant had no guilty connection with the transaction involving the theft of the cattle; that if appellant had been in his actual custody between the noon hour and the time he saw appellant at the jail he would not have released him; that when he found appellant at the jail talking to Brown he immediately arrested appellant. It is further noted that the testimony of the sheriff, in effect, shows that he suspected appellant had some guilty connection with the taking of the cattle in question.

We think the objection to the testimony of the sheriff was well taken. We quote the language of Judge Davidson in Buddy v. State, 227 S. W. 323, as follows: "One of the questions presented is that during the day of the 26th the justice of the peace sent for appellant. Appellant went to his office, and was there questioned with reference to this transaction, and his statement seems to have been reduced to writing. The whole matter came up before the justice of the peace with reference to the robbery transaction. Immediately after this appellant was arrested. Objection was made to the introduction of this testimony, which we think was well taken. Appellant was not strictly under arrest at the time, but he was suspected of crime and being questioned with reference to it by the justice of the peace. He was not warned. Under such circumstances this court has held in quite a number of cases that this character of testimony, either for impeachment or as original, was not introducible. See Wood v. State, 22 Texas App. 431, 3 S. W. 336; Reynolds v. State, 82 Texas Cr. R. 443, 199 S. W. 636; Oliver v. State, 81 Texas Cr. R. 529, 197 S. W. 185; Calloway v. State, 55 Texas Cr. R. 262, 116 S. W. 575; Fry v. State, 58 Texas Cr. R. 169, 124 S. W. 920; Simmons v. State, 79 Texas Cr. R. 341, 184 S. W. 226."

In Bonatz v. State, 212 S. W. 494, Judge Davidson, speaking for the court, said: "It is also a well-settled rule that a defendant may be shown to be under arrest by surrounding facts and en-

vironments. It is not necessary that the officer should make an arrest in formal words." See, also, Rollins v. State, 73 S. W. (2d) 541, and Lightfoot v. State, 35 S. W. (2d) 163.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.